Filed 10/3/14  In re Alayah B. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ALAYAH B., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>ALEXIS J.,<br><br>      Defendant and Appellant. | A140938<br><br>(Alameda County<br>Super. Ct. No. HJ11016413) |

Alexis J. (appellant), mother of three-year-old Alayah B., appeals from the juvenile court's orders, pursuant to Welfare and Institutions Code section 366.26,[1] terminating her parental rights and ordering adoption as the permanent plan.  Appellant contends (1) the juvenile court erred when it terminated her parental rights absent a finding of current unfitness; (2) the court erred when it found that she had failed to establish the applicability of the beneficial parent-child relationship and sibling relationship exceptions to adoption; and (3) the notice requirements of the Indian Child Welfare Act (ICWA) were not satisfied.  Because we find that notice was inadequate under ICWA, we shall conditionally reverse the order terminating parental rights and

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

remand the matter to the juvenile court so that proper notice can be provided. We shall otherwise affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL BACKGROUND

On February 9, 2011, the Alameda County Social Services Agency (Agency) filed a petition alleging that then three-month-old Alayah and her two-year-old half brother J.C. came under section 300, subdivision (b), after J.C. was treated at a hospital for unexplained injuries, including burns, sustained while in appellant's care. The petition contained additional allegations, including that J.C. did not appear well cared for and had a history of unexplained injuries while in appellant's care; that the home of appellant and Alayah's father (father) was dirty and unkempt; that appellant and father had a history of domestic violence; and that appellant and the fathers of both children had a history of criminal activities.[2]

In the February 10, 2011 detention report, the Agency reported that J.C.'s father had taken J.C. to the hospital to be treated for a burn on his left forearm that allegedly occurred while in the care of appellant in January 2011. Medical personnel determined that J.C. had other healing burns on his right hand and that explanations as to how J.C.'s injuries were sustained were not consistent with the injuries. The police went to appellant's home, where it was determined that Alayah was at risk due to her young age, the unexplained injuries to J.C., and the condition of the home. The Agency further noted that there was domestic violence between appellant and father, who lived together, and that there was a restraining order precluding contact between them.

On February 11, 2011, the juvenile court ordered both children retained.

---

[2] First and second amended petitions were later filed, alleging that J.C. was subject to juvenile court jurisdiction pursuant to subdivisions (a), (b), and (e) of section 300, and that Alayah was subject to juvenile court jurisdiction pursuant to subdivisions (b) and (j) of section 300. The allegations in both amended petitions were based on the same facts as those alleged in the original petition.

Father is not J.C.'s father. J.C. is not the subject of this appeal; nor is father a party to this appeal. We shall discuss facts related to them only as they are relevant to the issues before us.

In the jurisdiction/disposition report, filed on March 2, 2011, the Agency reported that J.C. had previously been taken into protective custody in December 2009, due to the presence of bruises of various ages on his face, back, neck, torso, and legs, and appellant's inability to explain most of the bruises. Family maintenance services had been provided to appellant and J.C.'s father and the case was closed in October 2010. Regarding the burn that brought J.C. to the hospital and led to the filing of the dependency petition in this case, appellant had told the social worker that it resulted from J.C. being electrocuted by a "circuit" in his bedroom while he was wearing urine-soaked clothes. Doctors noticed he had other healing burns on his right hand and that his arm was dislocated. Appellant's explanations for J.C.'s injuries were inconsistent with the injuries themselves.

The children had been placed initially with the maternal grandmother. The Agency recommended that both children be made dependents of the juvenile court and that reunification services be provided to the parents.

In an April 7, 2011 addendum report, the Agency reported that appellant and father were living together again. Appellant continued to be in denial regarding the apparent physical abuse suffered by J.C. and had failed to complete a psychological evaluation. Alayah had been placed with the paternal grandfather and stepgrandmother (paternal grandparents) on March 18, 2011. Father and appellant were told to contact the paternal grandparents to arrange supervised visitation with Alayah.

The jurisdiction/disposition hearing took place on April 15, 2011. The juvenile court sustained the second amended petition, adjudged Alayah a dependent of the court, and ordered continued out of home placement. The court also ordered reunification services for both appellant and father.

In a September 19, 2011 status review report, the Agency reported that appellant was working, but was currently homeless. Family members had expressed concern that appellant and father smoked marijuana in front of the children. Appellant and father were reportedly involved in a conflict with people in the community while father's infant son from another relationship, D.B., was with them. Appellant and father then left D.B.

3

with a babysitter before returning to the conflict, which involved gunfire. Father was arrested and charged with resisting arrest; he was released from jail on August 19. On June 21, a petition had been filed, pursuant to section 300, subdivisions (b) and (g), concerning D.B.

Appellant had only minimally complied with the requirements of her case plan, including the requirements that she participate in individual counseling, parenting education, a psychological evaluation, and substance abuse testing. Her visitation with Alayah had been sporadic in the six months since Alayah was placed with the paternal grandparents. Visitation was moved to the Agency's Hayward office due to the parents' conflict with the paternal grandparents and concerns about safety. Therapeutic visits were going well and appellant was engaging with Alayah during the visits.

Alayah appeared to be well-adjusted in her placement. She smiled often and sought comfort from the paternal grandparents. The stepgrandmother had taken a leave from work in order to bond with Alayah, and it had "really secured the attachment between Alayah and herself."

The Agency recommended that J.C. be returned to his father, with family maintenance services, and that appellant's reunification services as to J.C. be terminated.[3] It further recommended, with respect to Alayah, that both parents' reunification services be terminated and that a section 366.26 hearing be set for adoption or legal guardianship with the paternal grandparents.

In an addendum report filed on November 8, 2011, the Agency reported that appellant had become more involved with her case plan. She had been consistently attending individual counseling sessions and parenting education classes and was drug testing, although she was still testing positive for drugs and alcohol, particularly marijuana. The Agency further reported that visitation had been "an ongoing issue

---

[3] The Agency noted that, since Alayah and J.C. have separate fathers and since it was recommended that J.C. be returned to his father, they would not be able to live together.

4

throughout this case." Appellant and father had weekly therapeutic visitation with Alayah, during which they appeared to be engaged and enjoying the visits. However, appellant had not shown up for two of the visits in late October and early November. In addition, at appellant's request, the social worker had arranged for an additional day of visitation at the Gathering Place. Appellant, however, had decided she would prefer visits to occur through the paternal grandparents, once a mediation planned for mid-November had taken place, because her case planning and work commitments made it difficult to visit Alayah on weekdays.

At the November 15, 2011 six-month review hearing, the juvenile court found that appellant and father's progress had been minimal, but extended reunification services for three months.

In a January 18, 2012 addendum report, the Agency related that appellant continued to test positive for marijuana and had not yet completed a parenting education class, though she was engaged in the class when present. Appellant had not attended individual therapy since late November, but had completed a psychological evaluation. The psychologist who evaluated her recommended that appellant's children remain out of her care until she is "psychologically capable of caring for them."

As to visitation, appellant had missed most of the therapeutic visits with Alayah since mid-November 2011, and had not visited at all since early December. The therapeutic visitation therapist had told the social worker that "[o]ne of the biggest issues regarding attachment is [appellant's] lack of communication with Alayah's caregivers. She does not call them to ask about Alayah or inquire about her developmental milestones or physical and emotional well-being." The social worker also noted that "Alayah is now one year[] old and does not have the type of attachment with her parents that is needed for her to feel safe and secure. The parents have been on and off with visitation, they rejected the [social worker's] offer [of] a second visit per week, and do not inquire about Alayah's well-being." Although the parents seemed to love Alayah and want her back in their care, they had "not taken the steps necessary to ensure her safety."

5

Regarding sibling visitation, the Agency reported that Alayah and her half brother D.B. had visited with each other when the parents had come to the caregivers' home weekly between mid-November and late December. The paternal grandfather had said he would maintain the relationship between Alayah and D.B. Alayah had visited with her other half brother J.C. twice at the maternal grandmother's house. However, in mid-December, after J.C.'s father and the maternal grandmother got into a verbal and physical altercation in front of the children, it was decided that sibling visitation would occur at the Gathering Place.

In a March 22, 2012 addendum report, the Agency reported that Alayah, now one and one-half years old, was developmentally on target and in good general health. She also "appears bonded to her caregivers, as characterized by her physical affection towards them and her ability to be soothed in their presence."

Appellant had not participated in drug testing since January 2012, with irregular testing before that. She had completed her 12-week parenting education class, but had not attended individual therapy since the previous November. Appellant had visited Alayah at the paternal grandparents' or maternal grandmother's home approximately five times in January and February 2012. She often brought little gifts for Alayah when she visited. Appellant had not, however, called the paternal grandparents between visits to inquire about Alayah's well-being. Appellant no longer participated in therapeutic visitation, which she said she did not like.

In an April 24, 2012 addendum report, the Agency reported that appellant had taken a drug test, in which she tested positive for marijuana. She was participating in counseling, but it was not clear that the counselor was a licensed therapist.

Appellant had not called the paternal grandparents to arrange visitation or inquire about Alayah since late February 2012, but, after the paternal grandfather called her, she did visit once in mid-April. Regarding sibling visitation, the Agency related that Alayah had not visited with her half brother J.C. due to scheduling conflicts with J.C.'s father. Alayah had visited with her half brother D.B., of whom father now had custody, in early April. The social worker stated that "[v]isitation with Alayah should have been the

6

parent's [*sic*] number one priority regardless of the process. . . . When the parents were not given unsupervised visits, they tended not to visit Alayah. The [social worker] as well as the [paternal grandparents] have had to contact the parents regarding visiting their daughter and encourage them to visit with her. Though [the parents] are free to visit Alayah at the [paternal grandparents'] household, they only utilize this form of visitation on average two-three times per month." The social worker further noted that, in the more than one year since Alayah was removed from their care, the parents had "not maintained a significant or consistent amount of visitation with her."

On July 3, 2012, the Agency filed an addendum report, in which it related that appellant had agreed to visit with Alayah every Sunday at the paternal grandparents' home. She had visited seven times in May and early June, but had not shown up for three later visits in June. Appellant had also attended visits with Alayah and J.C. at the Agency office, which were going well. She had only begun regular visits with Alayah at the Agency in early May. Appellant had tested negative for marijuana in her most recent drug test. She had not attended individual therapy in several weeks.

At the July 9, 2012 review hearing, the court maintained visitation between appellant and Alayah, with "mother to show an interest in the minor, by calling the caregiver as to the child's well-being."

In a July 27, 2012 addendum report, the Agency reported that appellant had not visited with Alayah at the parental grandparents' home, and had not called to reschedule the visits or to inquire about Alayah's well-being. Appellant had been visiting with Alayah and J.C. twice monthly at the Agency office. She appeared active and engaged with the children during these visits.

On September 7, 2012, the juvenile court found that appellant and father's progress toward alleviating or mitigating the causes necessitating Alayah's placement had been minimal. The court terminated reunification services as to both parents.

In a November 30, 2012 status review report, the Agency reported that the parents were regularly attending their twice-monthly supervised visits at the Agency, during which they played with Alayah and took pictures. Regarding sibling visitation, J.C.'s

7

father had not followed up with agreements with the paternal grandparents to maintain sibling visitation with Alayah. D.B., who lived with appellant and father, had consistent contact with Alayah until the parents and paternal grandparents stopped speaking, although, in November, the parents had brought D.B. to a supervised visit at the Agency.

The paternal grandparents had told the social worker that they had "reconsidered legal guardianship and have decided to pursue adoption" of Alayah. "They have been committed to Alayah's well-being and were hoping that legal guardianship would show their commitment while keeping the dynamics of their family unit intact. However, they have concerns regarding Alayah's safety while in the presence of her parents." The paternal grandparents had told the social worker about a few incidents that raised these concerns. For example, they related that, after a hearing in August 2012, appellant shouted at them and used profane language. After a hearing in September 2012, appellant screamed at them for testifying and raised her fist at them in a threatening manner. A week later, while attending church together, appellant became argumentative and began yelling at the paternal grandparents while holding Alayah. A security guard intervened and the parents were asked to leave. After that, the paternal grandparents received threatening text and voicemail messages from the parents, which included threats to kill them and blow up their house. The parents denied that they had made any threats.

The paternal grandparents had told the social worker that they did not want to completely sever ties between Alayah, her parents, or her siblings, but wanted to provide a stable, safe home for her. The Agency noted that Alayah had been in the paternal grandparents' home since she was five months old, and they had "shown their willingness and ability to meet Alayah's needs both emotionally and physically." The Agency therefore recommended adoption as the permanent plan.

On December 13, 2012, the juvenile court ordered that the permanent plan goal of adoption was appropriate.

In a section 366.26 report, filed on February 19, 2013, the Agency reported that the parents continued to visit Alayah at the Agency, and had brought D.B. to visits as

8

well. During a visit, the social worker observed that Alayah seemed excited when the parents and D.B. arrived, and the two children played well together. Father's great-grandmother had also brought D.B. to visit Alayah at the paternal grandparents' home when she was visiting from Reno. Alayah still did not visit with J.C.

Finally, the Agency stated that the paternal grandparents, with whom Alayah had been placed for nearly two years, were able to meet Alayah's needs and she was thriving in their care. Their relationship appeared to be "close and healthy," and the social worker had observed Alayah demonstrate attachment to them during a visit. The paternal grandparents had indicated that they were not trying to replace Alayah's parents, and were open to contact between her and her parents if they felt assured that the contact would not threaten Alayah's safety or stability.

The Agency recommended termination of parental rights and a permanent plan of adoption.

In a March 19, 2013 addendum report, the Agency related that, "[s]ince visits began in February, after a month long hiatus, the parents have participated regularly and are engaged in visits." As the social worker observed, Alayah "displays a good deal of comfort during visits. She approaches her parents with items she's excited or curious about and they respond to her. She spends a large portion of her time playing with [D.B.]." Alayah was excited to see her family and displayed affection toward appellant, father, and D.B.

In a May 20, 2013 addendum report, the Agency reported that the parents continued to attend supervised twice-monthly visits with Alayah, who appeared to enjoy the visits. D.B. was present at nearly all of the visits as well. Alayah was able to transition to and from the visits comfortably.

9

At a hearing on May 28, 2013, the social worker testified that appellant and father appeared to meet the needs of Alayah during visits and Alayah "behaves like that's her mother, and she calls her Mommy." [4]

In a July 29, 2013 addendum report, the Agency reported that appellant had attended supervised visits on June 19, and July 10, but had missed visits on June 7 and July 24. In another addendum report, filed on September 26, 2013, the Agency related that appellant had given birth to a baby boy, Prince, in August 2013. Prince was present at a visit with appellant, father, Alayah, and D.B. on September 9, 2013, and Alayah was showing interest in her new brother.

At the section 366.26 hearing that took place on October 1, 2013, appellant testified that she and Alayah had a strong mother-child bond and Alayah knew appellant was her mother. She also testified that Alayah and her brother D.B. were "buddies," and that Alayah loved D.B. Alayah's half brother J.C. now lived with his father, but had unsupervised visitation with appellant from Friday through Sunday. J.C. had been close to Alayah when they had lived together, although he had not been present at appellant's recent visits with Alayah. Appellant believed Alayah would benefit from having an ongoing relationship with her siblings.

The paternal stepgrandmother testified that, after adoption, she was open to continued contact between Alayah and all of her siblings. The paternal grandparents had discussed with the social worker that, through mediation, they would develop a schedule so that all of the children could be together in visits.

At the conclusion of the section 366.26 hearing, the juvenile court found Alayah adoptable and further found that the beneficial parent-child relationship exception did not apply and that both parents were "unfit." The court took under submission "a small part

---

[4] Father filed a section 388 petition on February 26, 2013, in which he requested that Alayah be placed in his home, where her brother D.B. already lived. The petition was ultimately denied. However, on May 28, 2013, the parties stipulated that the evidence from the section 388 hearing would also constitute evidence for the section 366.26 hearing.

10

of the sibling relationship issue" regarding J.C. and Alayah's relationship. The parties agreed that the court could make its final ruling regarding the sibling relationship exception by way of a minute order.

In a status review report, filed on November 8, 2013, the Agency reported that Alayah was "thriving" with the parental grandparents, for whom an adoption home study had been approved. An adoption assessment had been completed and it was determined that Alayah was adoptable and likely to be adopted, as she was placed with caregivers who wished to adopt her. Appellant and father had not maintained contact with the Agency, and no visits had taken place since September 9.

On December 20, 2013, the juvenile court issued its orders pursuant to section 366.26, finding that Alayah was adoptable and that no exceptions to adoption were applicable. Regarding the sibling relationship exception, the court concluded that termination of parental rights would not be detrimental to Alayah. It noted that "there will be a substantial interference with the sibling relationship if the parents of J.C., the minor, persist in refusing to cooperate with the proposed adopted [*sic*] parents in ensuring post-adoption sibling contact. The proposed adopted [*sic*] parents have indicated that they are willing to engage in mediation regarding post-adoption sibling contact." The court terminated parental rights as to both appellant and father.

On January 28, 2014, appellant filed a notice of appeal.

## DISCUSSION

### I. *Finding of Current Unfitness*

Appellant contends the juvenile court erred when it terminated her parental rights absent a finding of current unfitness. As appellant puts it, "under the particular circumstances of this case, it was error for the juvenile court to order parental rights terminated on the basis of its prior detriment findings when all of the current evidence established that Mother was not unfit at the time of the selection and implementation hearing." In other words, according to appellant, the court improperly terminated parental rights "solely because doing so appeared to be in Alayah's best interest."

11

Appellant cites *In re P.C.* (2008) 165 Cal.App.4th 98, 106, in which the evidence showed that the mother had resolved the problems that had been the basis for jurisdiction and that her sole remaining issues involved poverty and lack of suitable housing. The appellate court rejected the Agency's argument that no further detriment finding was required before terminating "parental rights because when the court entered its order following the joint jurisdiction/disposition hearing, it found vesting custody of the children with mother would be detrimental." The court explained: "If that were true, . . . then no parent would ever have the incentive to try to reunify with his or her child." (*Ibid.*)

This case is distinguishable from *In re P.C.* in several ways. First, the juvenile court in this case *did* find current parental unfitness at the conclusion of the section 366.26 hearing when it specifically stated: "The court finds both parents unfit." Second, the court did not purport to base termination of parental rights on findings made at a prior hearing, but instead based its ruling on the totality of the evidence before it at the time of the hearing, which showed that, unlike the mother in *In re P.C.*, appellant had *not* resolved the problems upon which jurisdiction had been based. It is true, as appellant points out, that she had retained custody of her infant son Prince and had unsupervised visitation with J.C. on the weekends. The evidence regarding her reunification efforts with Alayah shows, however, that she had made little progress on her case plan and had not even visited consistently with Alayah. (Compare *In re P.C.*, *supra*, 165 Cal.App.4th at pp. 105-107.)

Accordingly, the juvenile court properly terminated appellant's parental rights after considering all of the evidence and finding current unfitness at the conclusion of the section 366.26 hearing.

## II. *Applicability of the Beneficial Parent-Child and Sibling Relationship Exceptions to Adoption*

Appellant contends the juvenile court erred when it found that she had failed to establish the applicability of the beneficial parent-child relationship and sibling relationship exceptions to adoption.

"Once reunification services are ordered terminated, the focus shifts to the needs of dependent children for permanency and stability. [Citation.]" (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1320.) "At a hearing under section 366.26, the court must select and implement a permanent plan for a dependent child. Where there is no probability of reunification with a parent, adoption is the preferred plan. [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) When the court finds that the child is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds by clear and convincing evidence, pursuant to one of the statutorily-specified exceptions, "compelling reason[s] for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) The parent has the burden of proving that termination of parental rights would be detrimental to the child under any of these exceptions. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.)

Appellate courts have differed on the correct standard of review for determining the applicability of a statutory exception to termination of parental rights. (Compare, e.g. *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [applying substantial evidence standard]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion standard]; *In re K.P.*, *supra*, 203 Cal.App.4th 614, 621-622 [applying substantial evidence standard of review to whether beneficial parent-child relationship exists and applying abuse of discretion to standard to whether that relationship provides a compelling reason to apply exception]; accord, *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

Although the "practical differences" among these various standards of review "are not significant" (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1351), "the Sixth Appellate District has cogently expressed the view that the review of an adoption exception incorporates both the substantial evidence and the abuse of discretion standards of review. (*In re Bailey J.*[, *supra*,] 189 Cal.App.4th [at pp.], 1314-1315.) The *Bailey J.* court observed that the juvenile court's decision whether an adoption exception applies involves two component determinations. 'Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental or sibling

relationship, which is a factual issue, the substantial evidence standard of review is the appropriate one to apply to this component of the juvenile court's determination.' (*Id.* at p. 1314.) The second determination in the exception analysis is whether the existence of that relationship or other specified statutory circumstance constitutes 'a "*compelling reason* for determining that termination would be detrimental to the child." ' (*Id.* at p. 1315.) This " ' "quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption," is appropriately reviewed under the deferential abuse of discretion standard.' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 530-531.) Like the courts in *In re J.C.* and numerous others cases, we believe that use of this hybrid standard of review is appropriate when reviewing juvenile court determinations regarding the statutory exceptions to adoption. (*In re J.C.*, at p. 531.)

## A. *Beneficial Parent-Child Relationship Exception*

Pursuant to section 366.26, subdivision (c)(1)(B)(i), the juvenile court will not terminate parental rights if it finds, by clear and convincing evidence, that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."

Here, with respect to the first prong of this exception—regularity of visitation—the juvenile court did not specifically address the consistency of visitation. However, the evidence in the record, as set forth above (see Factual and Procedural Background, *ante*), shows that visitation was problematic. Appellant stopped attending therapeutic visitation because she did not like it. She stopped visiting Alayah at the caregivers' home due in part to conflict with the paternal grandparents and failed to contact the paternal grandparents to inquire about Alayah's well-being. While appellant participated in supervised twice-monthly visits at the Agency, her attendance at those visits, which were generally quite positive, was sporadic. Appellant simply did not engage in significant or consistent visitation over the more than two and one-half years of Alayah's dependency.

14

Substantial evidence thus supports the juvenile court's implied finding that appellant had not "maintained regular visitation and contact with" Alayah (§ 366.26, subd. (c)(1)(B)(i)) and, therefore, did not satisfy the first prong of the beneficial parent-child relationship exception to termination of parental rights. (*Ibid.*; see *In re C.F.*, *supra*, 193 Cal.App.4th at p. 554 ["Sporadic visitation is insufficient to satisfy the first prong of the parent-child relationship exception to adoption"].)

In addition, even had appellant maintained regular visitation, substantial evidence supports the juvenile court's implied finding that appellant did not occupy a parental role in Alayah's life. (See *In re C.F.*, *supra*, 193 Cal.App.4th at p. 555.)

In *In re C.F.*, *supra*, 193 Cal.App.4th, at page 555, the appellate court explained that it had "interpreted the phrase 'benefit from continuing the relationship' in section 366.26, subdivision (c)(1)(B)(i) to refer to a 'parent-child' relationship that 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]

"A parent must show more than frequent and loving contact or pleasant visits. [Citations.] 'Interaction between natural parent and child will always confer some incidental benefit to the child. . . .' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment between child and parent. [Citations.] Further, to establish the section 366.2, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (Quoting *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, fn. omitted.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that

15

preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th at p. 1350.) "Application of this exception is decided on [a] case-by-case basis and a court takes into account such factors as the minor's age, the portion of the minor's life spent in the parent's custody, whether interaction between parent and child is positive or negative, and the child's particular needs." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 471.)

The evidence in this case shows that Alayah, who was three years old when parental rights were terminated, had not lived with appellant since she was three months old. While the evidence reflects that appellant was attentive and appropriate when she was with Alayah, and that Alayah enjoyed their visits a great deal, there is no evidence that Alayah was unhappy when visits ended or that she relied on appellant to meet her emotional needs. Rather, the evidence shows that it was the paternal grandparents who were meeting Alayah's needs and providing her with the stable, safe, nurturing environment that she needed. Alayah was attached to them and was thriving in their care. (See *In re C.F.*, *supra*, 193 Cal.App.4th at p. 557.)

The juvenile court thus reasonably found that appellant does not occupy a parental role in Alayah's life "resulting in a significant, positive, emotional attachment between" them that outweighs the stability and permanence Alayah will gain from being adopted. (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555; see also *In re Helen W.* (2007) 150 Cal.App.4th 71, 81 [that "mother clearly loved her children and believed they loved her[, that] she fed and changed them during visits, and sometimes they would call her 'mom,' " was "simply not enough to outweigh the sense of security and belonging an adoptive home would provide"]; compare *In re S.B.* (2008) 164 Cal.App.4th 289, 300-301 [father maintained a parental relationship with child "through consistent contact and visitation," and his devotion to child "was constant, as evinced by his full compliance with his case plan and continued efforts to regain his physical and psychological health"].)

The juvenile court did not abuse its discretion in finding that the parent-child beneficial relationship exception did not apply. (See 366.26, subdivision (c)(1)(B)(i); *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531.)

## B. *Sibling Relationship Exception*

Pursuant to section 366.26, subdivision (c)(1)(B)(v), the juvenile court will not terminate parental rights if it finds, by clear and convincing evidence, that "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption."

In *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951-952, the appellate court explained the two-step process for deciding whether the sibling relationship exception applies: "Under [former] section 366.26, subdivision (c)(1)(E) [now section 366.26, subdivision (c)(1)(B)(v),] the court is directed first to determine whether terminating parental rights would substantially interfere with the sibling relationship, . . . including whether the child and sibling were raised in the same house, shared significant common experiences or have existing close and strong bonds. [Citation.] . . . [¶] To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. . . . [¶] Moreover, even if [the court finds that] a sibling relationship exists that is so strong that its severance would cause the child detriment, the court then weighs the benefit to the child of continuing the sibling relationship against the benefit to the child adoption would provide." (*In re L.Y.L.*, at pp. 951-953; accord *In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1018-1019, disapproved on another ground in *In re S.B.* (2009) 46 Cal.4th 529, 537, fn. 5.)

In the present case, appellant argues that "there is no doubt that Alayah and [D.B.] share a significant sibling relationship, that Alayah and [J.C.] had a significant sibling relationship, and that Alayah and Prince could have a significant sibling relationship."

The evidence shows that Alayah did have positive, though limited, relationships with each of her siblings. She had not lived with J.C. since she was four or five months old, and had had limited visitation with him since then. Although she had only lived briefly with D.B., she had visited with him fairly often during the parents' twice-monthly visitation at the Agency and they enjoyed being together. Alayah also had spent some time with her infant brother Prince since his birth in August 2013. The evidence further shows that the paternal grandparents understood the importance to Alayah of continuing these sibling relationships.

When it terminated parental rights, the juvenile court indicated that the paternal grandparents were willing to engage in mediation regarding postadoption sibling contact and that it was not adoption, but J.C.'s parents, who had limited and could continue to limit contact between Alayah and J.C. As to D.B. and Prince, the evidence does not show, as appellant argues, that the paternal grandparents were uninterested in facilitating visitation. Instead, the evidence reflects that it was appellant's inappropriate behavior and the paternal grandparents' desire to keep Alayah in a safe, stable situation, that had limited the parents'—and hence D.B. and Prince's—visitation during the dependency. (See, e.g., *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1014 ["the children's best interests were served by adoption, and the selection of an alternative permanency plan would not resolve the family hostilities that had jeopardized the children's safety and prevented continued sibling visitation"]; *In re Jacob S.*, *supra*, 104 Cal.App.4th at pp. 1018-1019 [finding that "additional factors beyond termination of parental rights that will determine whether [the siblings] have a continuing relationship," which "will depend largely on whether [the older sister] wants it to, and not as much on whether parental rights are terminated"].)

Finally, as the juvenile court had already found in the context of the parent-child relationship exception, the evidence shows that, through adoption, the paternal

18

grandparents will be able to provide the stability, safety, and support that Alayah needs and that will allow her to continue to thrive. (See pt. II.A., *ante*; *In re L.Y.L.*, *supra*, 101 Cal.App.4th at pp. 951-952.) Appellant argues that, with a plan of legal guardianship instead of adoption, the court could have provided Alayah with the security of the paternal grandparents' care while also protecting her sibling relationships. Given the safety concerns and Alayah's need for a stable home environment, however, we believe the court did not abuse its discretion in concluding that, to the extent that adoption in this case would in fact lead to a loss of the sibling relationships, "the benefit of legal permanence through adoption" would outweigh Alayah's interest in keeping the sibling relationships intact. (§ 366.26, subd. (c)(1)(B)(v); *In re Daisy D.* (2006) 144 Cal.App.4th 287, 293.)

This case is similar to *In re Daisy D.*, *supra*, 144 Cal.App.4th at page 290, in which the child had lived with her half siblings until she was 10 months old. After she was placed apart from her siblings, in her paternal grandparents' home, she continued to visit her siblings regularly. (*Ibid*.) The evidence showed that the child and her siblings shared a significant bond and that the paternal grandparents intended to continue facilitating contact with the half siblings following her adoption. (*Id*. at pp. 290-291.)

The appellate court rejected the mother's argument that the juvenile court should have found that the sibling relationship exception to adoption applied.[5] The court found, first, that the mother's assertion that animosity between her and the paternal grandparents would interfere with postadoption sibling visits was speculative and unsupported by the record. (*In re Daisy D.*, *supra*, 144 Cal.App.4th at p. 293.) The court further noted that the author of the legislation adding the sibling relationship exception to adoption had stated that use of the new exception would likely be rare, "meaning 'that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the

---

[5] The court addressed this issue in the context of the mother's claim that counsel had been ineffective for failing to raise the sibling relationship exception at the section 366.26 hearing. (*In re Daisy D.*, *supra*, 144 Cal.App.4th at p. 292.)

19

benefits of adoption.'  [Citation]."  (*Ibid*., citing *In re L.Y.L*, *supra*, 101 Cal.App.4th at p. 950.)

The court then explained how the circumstances in that case did not support application of the exception:  "Here, the minor was just over one and one-half years old when she was placed separately from her half siblings in the home of the paternal grandparents.  In the ensuing two years, the minor had visits with her half siblings between two and four times a month.  And although the minor clearly enjoyed the time she spent with her half siblings, there was no evidence that the detriment she might suffer if visits ceased presented a sufficiently compelling reason to forgo the stability and permanence of adoption by caretakers to whom she was closely bonded."  (*In re Daisy D.*, *supra*, 144 Cal.App.4th at p. 293.)

Here, as in *In re Daisy D.*, while the evidence shows that Alayah's relationships with her siblings are meaningful to her, this is not the rare case in which those relationships are so strong that they outweigh the benefits of security and stability that adoption will bring.  (*In re Daisy D.*, *supra*, 144 Cal.App.4th at p. 293; see also *In re C.B.* (2010) 190 Cal.App.4th 102, 131.)  In addition, as already noted, the paternal grandparents had expressed their willingness to engage in mediation regarding postadoption sibling contact, and any substantial interference with Alayah's sibling relationship with J.C. would result, not from termination of parental rights, but from appellant's and J.C.'s father's persistence in refusing to cooperate with the paternal grandparents in ensuring postadoption sibling contact.

In sum, the juvenile court did not abuse its discretion when it found that appellant had failed to satisfy her burden of establishing applicability of the sibling relationship exception to termination of parental rights.  (See § 366.26, subd. (c)(1)(B)(v); *In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531.)

### III.  *ICWA*

Appellant contends the notice requirements of the Indian Child Welfare Act (ICWA) were not satisfied.  We agree.

## A. *Trial Court Background*

The original petition and the detention report contained a statement indicating that the case file in the previous case for Alayah's half brother J.C. "states that the mother identified herself as having Cherokee heritage and that on 1/22/2010 ICWA notices were sent out for that case." The amended petition in this case, filed on February 24, 2011, stated that "ICWA was completed in 2009" and that ICWA did not apply. In its section 366.26 report, filed on February 19, 2013, the Agency summarized its prior compliance with ICWA notice requirements, as follows: "On 12/29/09 the maternal grandmother . . . disclosed to [a social worker] that her family had Cherokee heritage. Notices were mailed to the Cherokee tribes. On 3/30/2010, the Cherokee Nation responded to say that the child [J.C.] is not eligible for enrollment.[6] On 01/29/2013, the undersigned spoke with the paternal stepgrandmother (who called the paternal grandfather) and learned that there is no Indian ancestry on the father's side. The child is not an Indian Child." Finally, in the status review report filed on November 8, 2013, the Agency stated: "The Indian Child Welfare Act does not apply. On 03/05/2013, the court made a finding that the Indian Child Welfare Act does not apply," although the record of that hearing does not appear to contain such a finding.

## B. *Legal Analysis*

"Congress passed the ICWA in 1978 'to promote the stability and security of Indian tribes and families by establishing minimum standards for removal of Indian children from their families and placement of such children "in foster or adoptive homes which will reflect the unique values of Indian culture . . . ." ' [Citing, inter alia, 25 U.S.C. § 1902.] [¶] The ICWA's procedural and substantive requirements must be followed in involuntary child custody proceedings when an 'Indian child' is involved. An 'Indian child' is defined by the ICWA as 'any unmarried person who is under age

---

**6** In the September 19, 2011 status review report, the Agency had related that, on March 30, 2010, "the Cherokee Nation tribe stated in a letter that there was not enough information to validate or invalidate any claim to Cherokee heritage."

eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.' (25 U.S.C. § 1903(4).)

"Among the procedural safeguards included in the ICWA is the provision for notice. The ICWA provides in part: 'In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention. If the identity or location of the parent or Indian custodian and the tribe cannot be determined, such notice shall be given to the Secretary [of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to the parent or Indian custodian and the tribe. . . .'[7] (25 U.S.C. § 1912(a).) 'Notice shall be sent whenever there is reason to believe the child may be an Indian child, and for every hearing thereafter unless and until it is determined that the child is not an Indian child.' (Cal. Rules of Court, rule 1439(f)(5).)" (*In re Jeffrey A.* (2002) 103 Cal.App.4th 1103, 1106-1107, fn. omitted.)

"Because ' "failure to give proper notice of a dependency proceeding to a tribe with which the dependent child may be affiliated forecloses participation by the tribe, [ICWA] notice requirements are strictly construed." ' [Citation.] The notice sent to the Indian tribes must contain enough identifying information to be meaningful. [Citation.] A 'social worker has "a duty to inquire about and obtain, if possible, all of the

---

**7** Pursuant to applicable federal regulations, in California, such notice must be given to the Bureau of Indian Affairs (BIA) in Sacramento. (25 C.F.R. § 23.11(b), (c)(12).) "The purpose of notice to the BIA is that it 'presumably has more resources and skill with which to ferret out the necessary information' [citation], such as which tribe or tribes might be entitled to notice." (*In re Antoinette S.* (2002) 104 Cal.App.4th 1401, 1406.)

22

information about a child's family history" ' required under regulations promulgated to enforce ICWA. [Citation.]

"To enable the juvenile court to review whether sufficient information was supplied, Agency must file with the court the ICWA notice, return receipts and responses received from the tribes. [Citation.] [¶] The notice requirements of ICWA are mandatory and cannot be waived by the parties. [Citation.]" (*In re Robert A.* (2007) 147 Cal.App.4th 982, 989.)

Here, the Agency was required to comply with the notice requirements of ICWA in Alayah's case, regardless of what it had done in a prior dependency case involving her half brother, J.C. (See *In re Robert A.*, *supra*, 147 Cal.App.4th at pp. 989-990.) However, it did not do so, which was error.

Nor can we find that the error was harmless. While father filed an ICWA-020 form indicating that he was not aware of any Indian ancestry, no such form appears in the record with respect to appellant. Similarly, the record contains no copies of either the certified notices sent to the Cherokee tribes in 2009 or 2010 or any responses from those tribes. Finally, it does not appear that any proof of the juvenile court's ICWA finding from the prior matter was submitted to the juvenile court in this matter. Consequently, it was not possible for the juvenile court in the present case to assess the propriety of the notice given, whether all three federally recognized Cherokee tribes received notice, whether either of the two Cherokee tribes besides the Cherokee Nation responded, or precisely what the juvenile court's finding that ICWA did not apply was based on. (Cf. *In re Jennifer A.* (2002) 103 Cal.App.4th 692, 703 [finding prejudicial error where Agency stated in a report that it had sent notices to tribes in compliance with ICWA, but no evidence was presented to juvenile court concerning Agency's communications with tribes].)

Respondent cites *In re J.M.* (2012) 206 Cal.App.4th 375, 383, in which the appellate court found that failure to include information about one of two siblings in ICWA notices constituted harmless error because both children claimed Indian heritage through the same mother. In that case, however, both siblings were part of the same

23

dependency case before the same judicial officer. (*Ibid.*; accord, *In re E.W.* (2009) 170 Cal.App.4th 396, 400-401.) The same is not true here.

As the Fourth District Court of Appeal explained in *In re Robert A.*, *supra*, 147 Cal.App.4th at page 990, in addressing an argument similar to respondent's, "we reject the Agency's attempt to bootstrap this case to the half sibling's case for ICWA purposes and thereby find the admitted ICWA error here was harmless. It is important to not lose sight of the fact that ICWA notices in separate dependency cases are not fungible evidence—even when the separate cases involve half siblings who share the same parent with Indian heritage. Agency had the duty in Robert's case to provide ICWA notice to the Cherokee tribes to allow the tribes to determine if Robert is an Indian child. Agency also had the duty to file with the juvenile court, which heard Robert's case, those notices, any responses it received and proof of required postal receipts to allow the court to determine if there was proper and adequate notice before deciding the ultimate issue— whether ICWA applied. Agency did none of these things in Robert's case and therefore the court's finding that ICWA did not apply cannot stand."

We conclude the lack of evidence of ICWA compliance necessitates conditional reversal of the juvenile court's orders, pending compliance with the ICWA notice requirements.

## DISPOSITION

The order terminating parental rights is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the Agency to comply with the notice provisions of ICWA and to file copies of all required documentation with the juvenile court. If, after proper inquiry and notice, no response is received or no tribe claims that Alayah is an Indian child, all previous findings and orders shall be immediately reinstated. If any tribe determines that Alayah is an Indian child within the meaning of ICWA, the juvenile court shall proceed in conformity with all provisions of ICWA. In all other respects, the orders are affirmed.

24

                                                 _____

                                                 Kline, P.J.

We concur:

_____

Richman, J.

_____

Stewart, J.